**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **JEVAN SNEAD, Individually and On Behalf of Others Similarly Situated** | § § § | |
| | § | |
| **PLAINTIFF,** | § § | |
| | § | |
| V. | § | **CIVIL ACTION NO. 5:16-cv-01134-OLG** |
| | § | |
| **EOG RESOURCES, INC.,** | § § | |
| | § | |
| **DEFENDANT.** | § § | |
| | § | |

**DEFENDANT EOG RESOURCES, INC.'S RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 39)**

Dated: January 19, 2017

Respectfully submitted,

*/s/ Carter Crow*

M. Carter Crow
State Bar No. 05156500
Kimberly F. Cheeseman
State Bar No.  24082809

**Norton Rose Fulbright US LLP**
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:    (713) 651-5151
Facsimile:      (713) 651-5246
carter.crow@nortonrosefulbright.com

*Attorneys for Defendant EOG Resources, Inc.*

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ...................................................................................................1

RELEVANT FACTS..............................................................................................1

   A.   EOG Contracted with Snead Because of His Experience in Oilfield Logistics. .......................1

   B.   Snead Controlled His Own Work, Including as to Where, When, and How to Perform the Job...................................................................................................2

   C.   EOG Highly Compensated Snead Because of the Nature of His Services................................6

   D.   Snead Provided His Own Tools or Used EOG's for His Convenience...................................7

   E.   EOG Paid Snead a Predetermined Sum of Money for His Services...........................................8

   F.   EOG and Snead Intended to Form an Independent Contractor Relationship. .....................10

   G.   Snead Stops Contracting with EOG and Then Shortly Files this Lawsuit.............................11

   H.   Chart of Key Disputed Facts.................................................................................11

SUMMARY JUDGMENT STANDARD .............................................................14

AUTHORITIES AND ANALYSIS......................................................................14

   I.   Genuine Issues of Material Fact Preclude Summary Judgment on Whether Snead Was Properly Classified as an Independent Contractor. .......................................14

      a.   The Dispute About Whether Snead Is an Independent Contractor or an Employee Involves Questions of Fact for the Jury........................................14

      b.   Subjective Intent Is Relevant. ...........................................................................16

      c.   There Is At Least a Material Fact Issue on Whether EOG Did Not Control Snead's Work...............................................................................................17

      d.   Snead Failed to Establish Undisputed Facts Regarding the Skill and Initiative for the Job..................................................................................................19

      e.   Snead Failed to Establish Undisputed Facts As to the Exclusiveness of his Position. .........................................................................................21

      f.   Snead Failed to Establish Undisputed Facts Regarding the Relative Investments of Snead and EOG..............................................................................22

      g.   Contrary to Snead's Motion, the Evidence Shows Snead Had the Opportunity to Earn a Profit or Loss. ...........................................................................24

   II.   EOG Has Presented Evidence Sufficient for a Reasonable Jury to Conclude that EOG Paid Snead on a Salary Basis........................................................................25

      a.   Genuine Fact Issues Exist as to Whether EOG Paid Snead on a Salary Basis.................26

         (i)   Section 541.602(a) Focuses on the Amount Received. ...............................26

         (ii)   Section 541.604(b) Permits EOG to Calculate Snead's Salary on a Daily

Basis. ...................................................................................................................28

    b.   Plaintiff's Cases Are Not Applicable Here. ............................................30

III.   Fact Issues Exist from which a Reasonable Jury Could Find that Snead's Compensation Warrants Application of the Half-Time Remedy. .................33

IV.   Snead Is Not Entitled to Summary Judgment on EOG's Good Faith Defense. ...................35

V.   Snead Is Not Entitled To Summary Judgment on His Claim that EOG Acted Willfully, Extending the Damages Recovery to Three Years. ......................38

    a.   No Court or Agency Has Found that EOG was Violating the FLSA. ............................39

    b.   The Timing of the Lawsuits and EOG's Litigation Defense is Irrelevant.........................40

CONCLUSION...........................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Akins v. Worley Catastrophe Response, LLC,*
No. 12-2401, 2013 WL 1907486 (E.D. La. May 8, 2013) .................................................32

*Alvarez v. Amb-Trans, Inc.,*
No. 11-cv-179, 2012 WL 4103876 (W.D. Tex. Sept. 17, 2012) ......................................40

*Anani v. CVS RX Services, Inc.,*
730 F.3d 146 (2d Cir. 2013)............................................................................................29

*Anani v. CVS RX Services, Inc.,*
788 F. Supp. 2d 55 (E.D.N.Y. 2011)...............................................................................27

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)........................................................................................................14

*Anunobi v. Eckerd Corp.,*
No. 02-CV-0820, 2003 WL 22368153 (W.D. Tex. Oct. 17, 2003) .................................28

*Auer v. Robbins,*
519 U.S. 452 (1997)........................................................................................................26

*Barnes v. Abandonment Consulting Servs., L.L.C.,*
No. 12-CV-01399, 2013 WL 12101068 (S.D. Tex. Aug. 5, 2013) .......................15, 16, 23

*Bayle v. Allstate Ins. Co.,*
615 F.3d 350 (5th Cir. 2010)...........................................................................................26

*Bennett v. SLT/TAG, Inc.,*
No. CV-02-65, 2003 WL 23531402 (D. Or. May 8, 2003) ........................................37, 38

*Branch v. CEMEX, Inc.,*
No. 11-1953, 2012 WL 2357280 (S.D. Tex. June 20, 2012) ..........................................14

*Browning v. Ceva Freight, LLC,*
885 F. Supp. 2d 590 (E.D.N.Y. 2012)..............................................................................21

*Bunday v. Suncoast Beverage Sales, LLP,*
No. 08-cv-00769, 2009 WL 10670167 (S.D. Fla. Sept. 18, 2009) ..............................33, 34

*Carrell v. Sunland Const., Inc.,*
998 F.2d 330 (5th Cir. 1993)........................................................................................18, 24

*Casey v. Livingston Parish Commc'ns Dist.,*
No. 07-30990, 2009 WL 577756 (5th Cir. Mar. 6, 2009) ...................................................35

*Cator v. DXP Enters., Inc.,*
Report and Recommendation, No. 15-cv-00179 (W.D. Tex. May 19, 2016) (ECF
29)...........................................................................................................................................30

*Cordero v. Voltaire, LLC,*
No. A-13-CA-253-LY, 2013 WL 6415667 (W.D. Tex. Dec. 6, 2013)..............................36

*Costello v. BeavEx, Inc.,*
No. 12-C-7843, 2013 WL 2156052 (N.D. Ill. May 17, 2013) ...........................................37

*Cowart v. Ingalls Shipbuilding, Inc.,*
213 F.3d 261 (5th Cir. 2000)......................................................................................... 26, 28

*Cromwell v. Driftwood Electrical Contractors, Inc.,*
348 F. App'x 57 (5th Cir. 2009) .......................................................................................15

*Dobbins v. Scriptfleet,*
No. 11-cv-1923, 2012 WL 2282560 (M.D. Fla. June 18, 2012)........................................37

*Donovan v. John Jay Esthetic Salons, Inc.,*
No. 81-1565, 1983 WL 2114 (E.D. La. 1983)....................................................................17

*Eberline v. Media Net, LLC,*
636 F. App'x. 225 (5th Cir. 2016) .....................................................................................18

*Eberline v. Media Net, LLC,*
68 F. Supp. 3d 619 (S.D. Miss. Dec. 2014) ..........................................................15, 16, 22

*Ellis v. J.R.'s Country Stores, Inc.,*
779 F.3d 1184 (10th Cir. 2015) .........................................................................................25

*Faludi v. US Shale Solutions. LLC,*
No. H-16-3467, 2017 WL 5969261 (S.D. Tex. Nov. 30, 2017) ........................................15

*Fernandez v. Transp. Designs,*
No. 16-022, 2017 WL 1283102 (W.D. Tex. Feb. 21, 2017)...............................................14

*Gallegos v. Equity Title Co. of Am.,*
484 F. Supp. 2d 589 (W.D. Tex. 2007) ..............................................................................35

*Gate Guard Services L.P. v. Solis,*
No. V-10-91, 2013 WL 593418 (S.D. Tex. Feb. 13, 2013) ..........................................16, 23, 24, 25

*Harris v. HKA Enters., Inc.,*
No. 06-2125, 2008 WL 906314 (E.D. La. Mar. 31, 2008)................................................37

*Hart v. Rick's Cabaret Int'l, Inc.*,
    967 F. Supp. 2d 901 (S.D.N.Y. 2013) ................................................................37

*Herman v. Express Sixty-Minutes Delivery Servs., Inc.*,
    161 F.3d 299 (5th Cir. 1998) ..............................................................................14

*Herman v. Mid-Atlantic Installation Services, Inc.*,
    164 F. Supp. 2d 667 (D. Md. 2000) .....................................................................22

*Hickey v. Arkla Indus., Inc.*,
    699 F.2d 748 (5th Cir. 1983) ..............................................................................21

*Hughes v. Gulf Interstate Field Services*,
    878 F.3d 183 (6th Cir. 2017) ..............................................................................31

*Keen v. DXP Enters.*,
    No. 15-cv-137, 2016 WL 3253894 (W.D. Tex. June 6, 2016) ....................26, 30, 31, 32

*Lipnicki v. Meritage Homes Corp.*,
    No. 10-cv-605, 2014 WL 923524 (S.D. Tex. Feb. 13, 2014) .............................35

*Mack v. Talasek*,
    No. V-09-53, 2012 WL 1067398 (S.D. Tex. Mar. 28, 2012) .....................16, 25

*Mascagni v. Schlumberger Tech Corp.*,
    No. 16-439, 2017 WL 3648315 (W.D. La. Aug. 22, 2017) ................................39

*McLaughlin v. Richland Shoe*,
    486 U.S. 128 (1988) .....................................................................................38, 39

*Mohammadi v. Nwabuisi*,
    171 F. Supp. 3d 545 (W.D. Tex. 2016) ...............................................................40

*Molina v. S. Florida Exp. Bankserv, Inc.*,
    420 F. Supp. 2d 1276 (M.D. Fla. 2006) ..............................................................22

*Murillo v. Coryell Cty. Tradesmen, LLC*,
    No. CV 15-3641, 2017 WL 2780750 (E.D. La. June 27, 2017) .........................16

*Overnight Transp. Co. v. Missel*,
    316 U.S. 572 (1942) .....................................................................................34, 35

*Powell v. Carey Int'l Inc.*,
    514 F. Supp. 2d 1302 (S.D. Fla. 2007) ...............................................................34

*Ransom v. M. Patel Enter. Inc.*,
    34 F.3d 377 (5th Cir. 2013) ................................................................................34

*Renteria-Camacho v. DirecTV, INC.*,
  No. 14-2529, 2017 WL 4619354 (D. Kan. Oct. 16, 2017) ................................................22

*Richard v. Mudtech Services*,
  No. 15-cv-3239, (S.D. Tex. Sept. 1, 2017) .................................................................. 31, 32

*Rodriguez v. Republic Services, Inc.*,
  No. 13-00020, 2013 WL 4054707 (W.D. Tex. Aug. 12, 2013) ......................................34

*Rodriguez v. Republic Servs., Inc.*,
  No. 13-cv-20, 2013 WL 5656129 (W.D. Tex. Oct. 15, 2013) ........................................34

*Roslov v. DirecTV Inc.*,
  218 F. Supp. 3d 965 (E.D. Ark. 2016) ..........................................................................17

*Saleem v. Corp. Transp. Grp.*,
  52 F. Supp. 3d 526 (S.D.N.Y. 2014) ..............................................................................21

*Saleem v. Corp. Transp. Grp., Ltd.*,
  854 F.3d 131 (2d Cir. 2017) ...........................................................................................17

*Songer v. Dillon Res., Inc.*,
  618 F.3d 467 (5th Cir. 2010) ..........................................................................................14

*Souza v. Sunbelt Auto Grp., Inc.*,
  No. 09–CV–1103, 2010 WL 1381894 (D. Ariz. April 6, 2010) ....................................27

*Spellman v. Am. Eagle Express*,
  680 F. Supp. 2d 188 (D.D.C. 2010) ...............................................................................37

*Thibault v. Bellsouth Telecomms.*,
  612 F.3d 843 (5th Cir. 2010) ..........................................................................14, 15, 18, 25

*Trahan v. Honghua Am., LLC*,
  No. 11-2271, 2013 WL 2617894 (S.D. Tex. June 10, 2013) .................................... 15, 17

*Urnikis-Negro v. Am. Family Prop. Servs.*,
  616 F.3d 665 (7th Cir. 2010) ..........................................................................................34

*Valcho v. Dall. Cnty. Hosp. Dist.*,
  658 F. Supp. 2d 802 (N.D. Tex. 2009) ...........................................................................27

*Wellman v. Grand Isle Shipyard, Inc.*,
  No. 14-831, 2015 WL 2169786 (E.D. La. May 8, 2015) ...............................................30

*Wilson v. Sys. & Processes Eng'g Corp.*,
  No. 10-CA-160-SS, 2010 WL 11575616 (W.D. Tex. Oct. 28, 2010) (Sparks, J.) ...........27

*Zannikos v. Oil Inspections (U.S.A.), Inc.*,
605 F. App'x 349 (5th Cir. 2015) ............................................................................... 38, 39

**Rules and Statutes**

29 U.S.C. § 213(a)(1) ........................................................................................................ 25

29 U.S.C. § 255(a) ............................................................................................................ 38

**Other Authorities**

29 C.F.R. § 541.100 .......................................................................................................... 26

29 C.F.R. § 541.200 .......................................................................................................... 26

29 C.F.R. § 541.300 .......................................................................................................... 26

29 C.F.R. § 541.301(b)(3) ................................................................................................ 25

29 C.F.R. § 541.601 ..................................................................................................... 26, 29

29 C.F.R. § 541.602 .......................................................................................................... 26

29 C.F.R. § 541.602(a) ................................................................................................. 26, 27

29 C.F.R. § 541.602(b)(1) ................................................................................................ 27

29 C.F.R. § 541.602 (b)(6) ............................................................................................... 27

29 C.F.R. § 541.602(c) ...................................................................................................... 27

29 C.F.R. § 541.604 ..................................................................................................... 26, 29

29 C.F.R. § 541.604(b) ............................................................................................. 26, 28, 29

29 C.F.R. § 778.112 ...................................................................................................... 33, 34

Fifth Circuit Civil Jury Instructions at Instruction 11.26 FLSA—Employee or
Independent Contractor, *available at*
http://www.lb5.uscourts.gov/viewer/?/juryinstructions/Fifth/2014civil.pdf ................ 15, 16, 17

Kerry Curry and Mark Curriden, "*Overtime Lawsuits Are On the Rise in Texas*,"
Houston Chronicle (Dec. 26, 2014) ............................................................................... 39

Seyfarth's 2017 Workplace Class Action Report, *available at*
http://www.workplaceclassaction.com/2017/01/its-here-seyfarths-2017-
workplace-class-action-report/ ....................................................................................... 39

## EXHIBIT LIST

Exhibit A   →   Declaration of Bobby Sanders
    –   Exhibit A-1:   EOG's Time and Attendance Policy
    –   Exhibit A-2:   Approved Vendor List from August 5, 2016.
    –   Exhibit A-3:   Invoice Dated 3/30/2015—4/12/2015 with Submission Date of 4/27/2015
    –   Exhibit A-4:   Invoice Dated 10/12/2015—10/25/2015 with Submission Date of 11/9/2015
    –   Exhibit A-5:   Invoice Dated 5/13/2016—5/26/2016 with Submission Date of 6/27/2016

Exhibit B   →   Excerpts from Deposition of Plaintiff Jevan Snead

Exhibit C   →   Instagram Photos and Invoices

    –   Exhibit C-1:   Instagram Photos (Same Set with More Visible Dates)

Exhibit D   →   Invoice Dated 8/31/2015—9/13/2015 and September 11, 2015 Instagram Photo

Exhibit E   →   Invoice Dated 9/28/2015—10/11/2015 and October 10, 2015 Instagram Photo

Exhibit F   →   Excerpts from Deposition of Bobby Sanders

Exhibit G   →   Declaration of Dennis Sissell

Exhibit H   →   Declaration of Robert Hunt

Exhibit I   →   Excerpts from Deposition of Jake Morrison

Exhibit J   →   Declaration of Monty Daniel

Exhibit K   →   Plaintiff Jevan Snead's Invoices to EOG

Exhibit L   →   EOG's Answers to Plaintiff Jevan Snead's First Set of Interrogatories

Exhibit M   →   Plaintiff Jevan Snead's 2014 Federal Tax Return (Filed Under Seal)

Exhibit N   →   E-mail regarding 24/7 Schedule

Exhibit O   →   Plaintiff Jevan Snead's Invoices for July 5-7, 2015

Exhibit P   →   Charts Summarizing Minimum Amount Paid to Snead Based on Invoices

Exhibit Q   →   Calendars Summarizing Invoices

Exhibit R   →   Plaintiff Jevan Snead's December 2013 and October 2015 Master Services Agreements with EOG

Exhibit S   →   Plaintiff Jevan Snead's March 2015 Agreements

Exhibit T   →   Plaintiff Jevan Snead's October 2015 Agreements

Exhibit U        →        Excerpts from Deposition of Gordon Goodman

Exhibit V        →        EOG's Answers to Plaintiff's Second Set of Interrogatories

## INTRODUCTION

Defendant EOG Resources, Inc. ("EOG") requests that the Court deny Plaintiff's Motion for Partial Summary Judgment ("Motion").   Doc. 39.   Snead has moved for partial summary judgment on his claim that his true classification is that of an employee, and Snead seeks a ruling that he is entitled to the FLSA default method for calculating his unpaid overtime compensation. He also seeks summary judgment on defenses asserted by EOG.   Snead emphasizes that other courts have granted summary judgment on these issues.   However, many more courts have denied summary judgment finding that issues of fact entitle the defendant to a jury trial.   This case is like the many cases where summary judgment is patently improper.

## RELEVANT FACTS

At pages 1-8 of his Motion, Snead collects facts which he claims are applicable to his employee status.   But the facts are cherry-picked and they thus paint an inaccurate picture of Snead's relationship with EOG.   Following is a more complete statement of facts and a chart that collects key facts which are controverted and which prevent summary judgment.

**A.      EOG Contracted with Snead Because of His Experience in Oilfield Logistics.**

EOG is an independent oil and gas company engaged in the exploration, development, and production of oil and gas wells.   Declaration of Bobby Sanders ¶ 1 (hereinafter "Dec. Sanders"), attached as Ex. A.   To carry out its business, EOG engages with various types of independent contractors who perform the work of drilling, completing, and producing the wells and building the infrastructure necessary to produce and transport the oil from the field.   *Id.* ¶ 4.   The contractors include different types of oil field service companies, such as drilling companies, mud companies, trucking companies, etc.   *Id.* ¶ 5.   During the well development process, these contractors use numerous types of commodities, such as water.   *Id.*   EOG retains other contractors to supply and dispose of these commodities.   *Id.*

1

EOG needed help managing the logistics of the numerous trucking companies that deliver and dispose of the water and other fluids used during the drilling or completion of a well. *Id.* ¶ 10. Delivery and disposal of fluids is not part of EOG's core business. *Id.* ¶ 12. EOG contracted with Snead and other contractors to provide various logistical services. *Id.* ¶ 10. Bobby Sanders, the Manager of the Shared Services Group ("SSG") at EOG, retained and coordinated the independent contractors, and Sanders worked with Jake Morrison, a Foreman in SSG. *Id.* ¶ 12. Both Sanders and Morrison are employees of EOG. *Id.*

EOG selected Snead because he had years of prior experience working in the oilfield and in particular with oilfield logistics. *Id.* ¶ 13. Snead had worked previously in the oilfield for trucking company Stevens Tanker, and before that, in oilfield logistics for Plains Exploration, and as petroleum landman *Id.*; *see also* Deposition of Jevan Snead at 20:12-18; 24:16-18; 29:14-18; 31:4-32:4; 47:1-10 (hereinafter "Depo. Snead"), attached as Ex. B; *id.* at 50:20-23 ("Q. Okay. And so do you feel like you learned a lot about the oilfield trucking logistics business when you were at Stevens Tanker? A. Yes, sir."); *id.* at 52:6-10 ("Q. Okay. And when you were at Stevens, did you learn to deal with the water logistics business up to EOG's satisfaction? A. I -- I believe so. I believe that's part of the reason I was hired at EOG.").

## B.     Snead Controlled His Own Work, Including as to Where, When, and How to Perform the Job.

Snead had extensive freedom in terms of where, when, and how he performed his work. The vast majority of the work was performed over his cell phone—all that was needed was a cell phone signal. Dec. Sanders ¶ 15. A description of the process is as follows. An EOG representative from the well site would call Snead and explain the number and type of trucks that were needed at a well location, as well as the time of delivery. Depo. Snead at 60:15-61-8; 63:4-25; 65:19-67:8. After receiving a call, Snead had the discretion and ability to select any vendor that he felt would be the best and most economically efficient for the particular job. *Id.*; *see also* Dec.

2

Sanders ¶ 17.  In making these decisions, Snead would consider factors such as the prices offered by the vendor, the location of the vendor, and the credibility and quality of the services provided by the vendor.  Depo. Snead at 60:15-61-8; 63:4-25; 65:19-67:8.  Snead admits that his decisions had a "meaningful role" in saving EOG money.  *Id.* at 72:15-74:6.  EOG merely required that the vendor be on its approved vendor list, which is hundreds of pages long and exists solely to ensure that vendors meet the requirements of EOG's Master Services Agreement.  *Id.* at 60:15-61-8; Dec. Sanders ¶ 17; Approved Vendor List, attached as Ex. A-1.

As an independent contractor, Snead controlled the means, manner, and method in which he performed his job.  Dec. Sanders ¶ 15.  EOG was interested in the end result only—that the calls were being answered by someone and the services delivered to the rigs.  *Id.*  Snead could perform his duties anywhere, whether in the office or on the golf course.  *Id.*; Declaration of Dennis Sissell ¶¶ 8-10 (hereinafter "Dec. Sissell"), attached as Ex. G (stating "EOG does not micro manage or control the work that I have to perform for them" and "I could have done most or all of [my] work at home or someplace else"); Declaration of Robert Hunt ¶ 8, (hereinafter "Dec. Hunt"), attached as Ex. H. EOG did not expect Snead to come to the EOG office Monday through Friday or at set times:

> Q.    Did you expect him to come to the office?
> A.    I expected him to get his position -- his job done which at times would probably mean coming to the office.
> Q.    Did you expect him to come to the office Monday through Friday?
> A.    No.

Depo. Sanders at 40:1-7.  In fact, Snead often invoiced EOG as having worked while engaged in activities such as golfing, attending football games, or while on vacation in California.  *See* Instagram Photos and Invoices, attached as Ex. C, Ex. C-1; Depo. Snead at 108:21-109:11; 109:16-110:10; 111:18-113:4; 113:20-114:13; 115:15-117:7; 117:11-119:4; 119:6-120:19; 120:21-121:5; 121:14-121:23; 122:10-123:20; 123:25-124:7; 124:17-125:18; 125:20-126:8; 126:21-127:22; 128:6-129:13.

Two examples are as follows:



| Name: | Jevan Snead | | | 9/14/2015 | Vendor # | 364083 | |
|---|---|---|---|---|---|---|---|
| ADDRESS: | 271 E. Garza | | | Company: EOG | | | |
| City: New Braunfels, TX 78130 | | | | Ordered By: | Bobby Sanders | | |
| DATE | GEN | SUB | PROPERTY # | RATE | TRUCK | MISC. | TOTAL |
| 8/31/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/1/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/2/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/3/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/4/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/5/2015 | 830 | 207 | 90063-300 | 300.00 | | | $300.00 |
| 9/6/2015 | 830 | 207 | 90063-300 | 300.00 | | | $300.00 |
| 9/7/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/8/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/9/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/10/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/11/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/12/2015 | 830 | 207 | 90063-300 | 300.00 | | | $300.00 |
| 9/13/2015 | 830 | 207 | 90063-300 | 300.00 | | | $300.00 |
| Amount Invoiced | | | | | | | $5,700.00 |

The Palmer Course La Cantera >

❤ 33 likes
jevansnead Survived another tough Friday #givinglessons to @yorkgill
View 1 comment
SEPTEMBER 13, 2015

*See* Invoice Dated 8/31/2015—9/13/2015 and September 11, 2015 Instagram Photo attached hereto as Ex. D; *see also* Depo. Snead at 120:21-121:23.



| Name: | Jevan Snead | | | 10/12/2015 | Vendor # | 364083 | |
|---|---|---|---|---|---|---|---|
| ADDRESS: | 271 E. Garza | | | Company: EOG | | | |
| City: New Braunfels, TX 78130 | | | | Ordered By: | Bobby Sanders | | |
| DATE | GEN | SUB | PROPERTY # | RATE | TRUCK | MISC. | TOTAL |
| 9/28/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/29/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 9/30/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 10/1/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 10/2/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 10/3/2015 | 830 | 207 | 90063-300 | 300.00 | | | $300.00 |
| 10/4/2015 | 830 | 207 | 90063-300 | 300.00 | | | $300.00 |
| 10/5/2015 | 830 | 207 | 90063-300 | 300.00 | | | $300.00 |
| 10/6/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 10/7/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 10/8/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 10/9/2015 | 830 | 207 | 90063-300 | 300.00 | 150.00 | | $450.00 |
| 10/10/2015 | 830 | 207 | 90063-300 | 300.00 | | | $300.00 |
| 10/11/2015 | 830 | 207 | 90063-300 | 300.00 | | | $300.00 |
| Amount Invoiced | | | | | | | $5,550.00 |

Cotton Bowl >

❤ 58 likes
jevansnead Hey.... It's game Bae #hookem #OUSUCKS
View all 7 comments
OCTOBER 10, 2015

*See* Invoice Dated 9/28/2015—10/11/2015 and October 10, 2015 Instagram Photo, attached

hereto as Ex. E; Depo. Snead at 125:20-126:6.[1]

Snead charged EOG for an entire day's work on these days, which is consistent with what

EOG told him:

> Q.    Did you discuss the hours expected for the job, anything besides the fact that
>       he might get calls at various times throughout the day and the night?
> A.    Probably the largest thing that we discussed was 'if you take a call that just
>       took two minutes, you could charge us for that day.'

Deposition of Bobby Sanders at 40:10-15 (hereinafter "Depo. Sanders"), attached as Ex. F.  So long

as Snead took a call during the day, whether it lasted two minutes or twenty, he could charge EOG

$300.  *Id.*  EOG explicitly told Snead that he had this flexibility:

> Q.    And did you tell him what the position entailed?
> A.    Yes.
> Q.    What did you tell him?
> A.    That it was managing different kinds of trucks to get to the -- to the rig sites
>       and the well sites and that calls came in at various times of the day and night.
> Q.    Anything else?
> A.    **And he had a lot of flexibility to do what he wished to do.**
> Q.    **You told him he had a lot of flexibility?**
> A.    **Yes.**

Depo. Sanders at 39:13-25 (emphasis added).  If Snead decided not to work, he had to forward his

phones to another contractor, but he was not required to seek EOG's permission to do so:

> Q.    And if he was to forward the -- his phone to the other contractors, would he
>       have to get you or Mr. Morrison's approval for that?
> A.    No.

*Id.* at 150:20-23.  EOG did not discipline, coach, or counsel Snead regarding when he forwarded his

phone.  Deposition of Jake Morrison at 124:2-11 (hereinafter "Depo. Morrison"), attached as Ex. I

("Q.  What did you do to discipline Mr. Snead?  A. I didn't do anything to discipline Mr. Snead.  He

---

[1] Not only do these social media photos illustrate that Snead had control over where, when, and how
he performed his work, they are also indicative of hours worked.  Tellingly, Snead does not move
for summary judgment on the issue of damages because genuine issues of material fact exist as to
how many hours Snead actually worked.

was basically an independent contractor, and I figured if those guys got tired of him not answering the phone and forwarding it, they wouldn't let him forward to him. So I let them work it out among themselves is basically how I did it.   Q. Okay. So you didn't coach or counsel Mr. Snead in any respect for that?  A. No, ma'am.).

EOG did not provide any substantive training to Snead on how to perform the job.  *Id.* at 117:8-14.  The contractors trained each other.  *Id.*; *see also* Dec. Sissell ¶ 7; Declaration of Monty Daniel ¶ 12 (hereinafter "Dec. Daniel"), attached as Ex. J.  Snead's training was minimal, however, because "he should know[n] a lot of it coming in as an independent contractor."  Depo. Morrison at 118:1-8.  Any other training that was offered to Snead was not substantive, optional, and available to anyone who performed services for EOG.  *Id.* at 114:24-115:18; Dec. Sanders ¶ 11.

In contrast, EOG's employees have far less flexibility and freedom as Snead.  *Id.* ¶ 16.  For instance, EOG employees are required to account for their time and submit this documentation to EOG.  Depo. Morrison at 194:21-195:9 (explaining that as an employee there are "policies and structures" that he has to submit to EOG, including proof of hours worked and a record of vacation used); Depo. Snead 135:13-15 (admitting that he did not have to follow EOG's time and attendance policy, which was for employees).  EOG employees have a limited amount of vacation and are required to get approval to use vacation days.  Dec. Sanders ¶ 16.  EOG employees are also required to submit a doctor's note if they miss a certain number of days of work.  *Id.*

## C.     EOG Highly Compensated Snead Because of the Nature of His Services.

EOG paid Snead $138,150.00 in 2014; $143,400.00 in 2015; and $92,965.00 in the eight months he contracted with EOG in 2016.  Dec. Sanders ¶ 18.  Snead submitted invoices for his services to EOG.  *See* Invoices, attached as Ex. K.  EOG did not require Snead to use any particular form invoice, and neither Sanders or Morrison provided Snead with the invoice template he used. Depo. Snead at 89:13-23; Depo. Sanders at 148:8-14; Dec. Sanders ¶ 18.

EOG compensated Snead so highly because of the temporary nature of his services.  Depo. Sanders 45: 21-25.  Depending on the expansion of the Eagle Ford shale, his services may be short in nature or longer.  *See* Dec. Sanders ¶¶  8-9; *see also* Dec. Daniel ¶ 3 ("Jake told me that I should not spend all my money, because the work would not be permanent.  It would end when EOG started to pull back its work in the Eagle Ford.").

In fact, because of the temporary nature of the position, EOG compensated Snead much higher than its own employees.  Dec. Sanders ¶ 8; Dec. Daniel ¶ 3 ("I learned that, in this role, EOG paid me more than it paid its own employees, like Jake Morrison.").  For instance, EOG paid Snead approximately $40,000-$50,000 per year higher than EOG Foreman Jake Morrison, who earned $97,000 annually during that time period.  Dec. Sanders ¶ 18.

Snead performed work as an independent contractor for EOG from January 2014 through August 2016 because of increased activity in the Eagle Ford.  *Id.* ¶ 9.  But Snead was free to end his contract with EOG at any time.  *Id.*  Snead was also free to perform services for other companies while he contracted with EOG, so long as it did not interfere with the work EOG was paying him to do. *Id.*  For example, while contracting with EOG, Snead also entered into a contract with "Upper Deck" to sign football cards for which he received compensation.  Depo. Snead 149:20-151:3.

### D.       Snead Provided His Own Tools or Used EOG's for His Convenience.

Snead provided the two primary tools required for his position—a cell phone and a truck. Snead made the decision to use his own cell phone to answer calls for the job.  *Id.* at 60:7-14.  EOG did not subsidize or pay for Snead's phone, phone plan, or truck.  *Id.* at 76:16-24.

As an independent contractor, Snead was also required to provide for and pay for his general liability insurance.   *Id.* at 88:1-89:5.   Sometimes EOG would waive parts of the insurance requirement, like workers' compensation, if the work performed posed low risk of injury.  Depo.

Sanders 160:6-13. Sanders decided to waive Snead's worker's compensation insurance requirement for this reason. *Id.* EOG received no benefit, however, from doing so. *Id.*

In addition, EOG provided Snead with certain supplies as a matter of convenience. For example, EOG provided Snead with an e-mail address and access to EOG systems so that he could communicate with vendors as a contractor of EOG. Dec. Sanders ¶ 20. While EOG allowed Snead to have an EOG business card so that he could identify himself to vendors, the card clearly stated "consultant." Def's Answer to No. 5, Pl's First Set of Interrogatories, attached as Ex. L. Moreover, EOG stopped this practice in 2016 to avoid giving any impression internally or to the public that these individuals were EOG employees, which they were not. *Id.*; *see also* Depo. Morrison at 83:8-11. EOG also allowed Snead to use EOG's office supplies for his convenience, but he was not required to so. Dec. Sanders ¶ 20; *see also* Dec. Daniel ¶ 13 ("EOG did allow me to use its offices and office supplies, but that was for my convenience and at my option. I could use my own equipment and supplies if I chose to do so."). Because part of Snead's job involved meeting with vendors, EOG also allowed Snead to use an office space for his convenience, but he want not required to do so. Dec. Sanders ¶ 21; Depo. Sanders at 40:1-7.

Snead also took deductions from his federal taxes as an independent contractor. For instance, in his 2014 return, Snead deducted $3,297 for his home office expenses; $21,779 for use of his vehicle; $3,182 for insurance; $511 for supplies; and $4,735 for meals and entertainment. Depo. Snead 131:3-25; *see also* 2014 Tax Return, attached as Ex. M.

**E.     EOG Paid Snead a Predetermined Sum of Money for His Services.**

EOG guaranteed Snead a minimum sum of $2,100 per week, calculated based on $300 daily for seven days in the workweek. Dec. Sanders ¶ 22; *see* Depo. Morrison at 174:20-25; *see also* 24/7 E-mail, attached as Ex. N. Indeed, EOG guaranteed Snead work every day. *See* Dec. Sanders ¶ 22. In addition to the guaranteed minimum, Snead had the opportunity to earn an additional $150 on

the days in which he drove his truck into the office or the field.  Dec. Sanders ¶ 23.  This $150 payment was akin to a reimbursement for use of his vehicle.  Depo. Sanders 41:4-18; 146:23-147:1.  This truck payment was only offered to contractors and not employees.  *Id.*

Snead's pay was not subject to reductions because of the quality or quantity of the work performed.  Dec. Sanders ¶ 24.  EOG expressly told Snead that he would get paid regardless of whether he answered one phone call or ten phone calls, and EOG never reduced his pay if he was unavailable to answer the phone:

> Q. Sure. Anything else you discussed about pay besides the day rate, whatever that amount was, and the additional fee that you would give if his work involved driving a vehicle?
>
> A. The main thing that we discussed was it was a very attractive rate, and if they just worked five to ten minutes a day, they would get paid. The only time we would not pay it is if they were -- if they were not available on their phone.
>
> Q. Do you ever recall any occasion during Mr. Snead's tenure with the company where you declined paying him a day rate because he hadn't responded to a call?
>
> A. No.

Depo. Sanders at 41:23-42:11; *see id.* at 40:10-15.  As illustrated in the charts attached as Exhibit P, the only time Snead's pay was reduced is during his first week of work and in the four weeks where Snead decided himself to take an entire day off for personal reasons and to forward his phone calls.  *See* Charts Summarizing Invoices, attached as Ex. P; *see also* Dec. Sanders ¶ 24.  EOG did not require Snead to seek EOG's permission to forward his phones.  Depo. Sanders at 150:20-23.  But even when Snead forwarded his phone calls and he performed no work, there are days where EOG still paid Snead.  *Compare* Dec. Sissell ¶ 6 ("Mr. Snead forward his phone calls to me frequently.  For example, once he forwarded his calls to me when he was on vacation, and that time he was gone two-three days.  That was during the July 4, 2015, holiday when Snead went to Destin, Florida.  He forwarded his calls to me during that entire time."), *with* Snead's July 5-7, 2015 Invoices, attached as Ex. O (invoicing EOG for July 5, 6, and 7, 2015).

In 2016, to avoid any confusion that the independent contractors working with Shared Services were paid a guaranteed minimum sum for the week, EOG changed the terminology to weekly rate. Dec. Sanders ¶ 28; Depo. Sanders at 94:5-13. In discussing the change, Sanders made clear that a guaranteed sum was already the existing practice:

> Q. Why did you decide to switch people to weekly rates?
> A. Essentially that's to simplify everything. They were all -- generally everybody was being paid everyday anyway, so it was to clarify that if you were up late one night and you didn't -- and you didn't answer the call the next day, we were not going to dock you a day for something that we had you up doing.

Depo. Sanders at 95:1-8. If Snead had worked for EOG during this time, Snead's weekly rate would have been $2,100. Dec. Sanders ¶ 28; Depo Sanders 94:23-25. Snead's invoices show that except for five weeks, Snead always received the minimum guaranteed amount of $2,100, which is well in excess of $455. *See* Ex. P.

In 2014, Snead invoiced EOG for **349 days**. In 2015, Snead invoiced EOG for **336 days**. In 2016, Snead invoiced EOG for **220 days** in the eight (8) months he contracted with EOG. *See* Calendars Summarizing Invoices, attached as Ex. Q; *see also* Ex. K. In sum, EOG guaranteed Snead a minimum weekly sum of $2,100. Snead's compensation exceeded this sum in all weeks worked, and was only reduced if he decided not to work for an entire day for personal reasons and Snead forwarded his phone calls for the entire day. Dec. Sanders ¶ 22; *see also* Ex. K; Ex. P; Ex. Q.

## F.     EOG and Snead Intended to Form an Independent Contractor Relationship.

It was the intent of EOG and Snead to enter into an independent contractor relationship, which is clear from the extensive paperwork signed by Snead. Snead and EOG executed two Master Services Agreements ("MSA")—in December 2013 before Snead first started contracting in January 2014, and approximately one and half years later in October 2015. *See* MSA Documents, attached as Ex. R. By signing both MSAs, Snead expressly agreed that he intended to enter into an independent contractor relationship. *See id.* ¶ 5A.

To be sure that Snead understood he was entering into an independent contractor relationship, EOG made Snead sign several other documents, which included instructions that Snead should consult an attorney if he had any concerns.  For example, in March 2015, at which point Snead had been contracting with EOG for about 15 months, Snead signed a document titled "Agreement between EOG Resources, Inc. and Contractor to Establish Independent Relationship." *See* March 2015 Agreements, attached as Ex. S ("If you are not certain whether all parties meet the requirements for entering into this agreement, you may wish to consult an attorney."); *see also* Depo. Snead at 81:1-14.  Snead expressly states that he would not have signed his agreement in March 2015 if he felt like it was inaccurate.  Depo. Snead at 85:16-19.

EOG and Snead signed two more agreements in October 2015, again, ensuring that he understood and agreed to the independent contractor relationship.  *See* October 2015 Agreements, attached as Ex. T.  Again, Snead made the decision not to consult an attorney.  Depo. Snead 85:20-86:4.  At no point did Snead ever inform EOG that he thought he was not an independent contractor.  Depo. Snead 82:24-83:8.

**G.      Snead Stops Contracting with EOG and Then Shortly Files this Lawsuit.**

In August 2016, Snead decided to stop contracting with EOG, which he was free to do under the MSA, and he started working in the medical device/pharmaceutical industry.  Dec. Sanders ¶ 9.  Less than three months later on November 10, 2016, Snead filed this lawsuit.  Doc. 1.  Although collective action notices were issued in the case, no other individual joined.  Doc. 21.

**H.      Chart of Key Disputed Facts.**

Although not exhaustive of the material facts in dispute, which are more fully described herein, the following chart summarizes several key genuine disputes of the material facts:

| Plaintiff's Facts | Disputed Facts |
|---|---|
| Snead had little discretion how to perform his work because EOG controlled his daily tasks and decision making.  Mot. at 12. | EOG did not control how Snead performed his work.  Dec. Sanders ¶ 15.  EOG did not control his daily tasks or decision making.  *Id.*; Dec. Sissell ¶¶ |

| | |
|---|---|
| | 8-10; Dec. Hunt ¶ 8.   Snead generally had the discretion and ability to select any vendor that he felt would be the best and most economically efficient for the particular job.   Depo. Snead at 60:15-61-8; 63:4-25; 65:19-67:8; 72:15-74:6; Depo. Morrison at 118:9-119:8.     In making these decisions, Snead would consider factors such as the prices offered by the vendor, the location of the vendor, and the credibility and quality of the services provided by the vendor.   Depo. Snead at 60:15-61-8; 63:4-25; 65:19-67:8; 72:15-74:6.   Snead acknowledged that he exercised this discretion 70% of the time. *Id.* at 63:4-25. |
| EOG controlled where Snead had to perform his work. Mot. at 12-13. | EOG did not control where Snead performed his job.   He was free to perform his job at home or while golfing and he often did.   Dec. Sanders ¶ 15; Depo. Sanders at 39:13-25; 40:1-7; Instagram Photos, Ex. C. |
| Snead worked exclusively for EOG. Mot. at 12. | Snead did not work exclusively for EOG, he performed work for Upper Deck signing football cards.   Depo. Snead 149:20-151:3.   Snead also had the option to work for other companies while contracting with EOG. Dec. Sanders ¶ 9. |
| Snead's position was not temporary. Mot. at 12. | Snead's position was temporary and dependent on development of the Eagle Ford.   Depo. Sanders 45: 21-35; Dec. Sanders ¶¶ 7-8; Dec. Daniel ¶ 3. |
| Bobby Sanders and Jake Morrison supervised Snead.  Mot. at 2 | Sanders and Morrison did not supervise how, when, and where Snead performed his job. Depo. Sanders at 150:20-23; Depo. Morrison at 124:2-11; 117:8-14; 118:1-8; Dec. Daniel ¶ 12; Dec. Sissell ¶; Dec. Sanders ¶ 15. |
| Snead did not have to provide any equipment or incur any expenses to perform work for EOG. Mot. at 14. | Snead provided the two primary tools for performing his job—his cell phone and truck. Depo. Snead 60:7-14; 76:16-24. |
| EOG provided him with the tools and equipment that were required to perform the job.  Mot. at 3-4. | EOG offered Snead use of office space and office supplies as a convenience; these items were not required to perform the job.   Dec. Sanders ¶ 20; Dec. Daniel ¶ 13.  Snead worked from home as did other contractors. *Id.*; Dec. Sanders ¶ 15. |
| EOG waived or reimbursed all of Snead's insurance requirements. Mot. at 5. | Snead was required to carry a general liability insurance policy even though EOG waived the worker's compensation portion. Depo. Snead 88:1-89:5. |
| Snead had limited experience in the oil and gas industry. Mot. at 13. | EOG selected Snead for an interview because he had years of experience in the oil and gas industry, with two years specifically dedicated to oilfield logistics. Dec. Sanders ¶ 13; Depo. Sanders at 209: |

| | |
|---|---|
| | 2-12; Depo. Snead at 20:12-18; 24:16-18; 31:4-32:4; 47:1-10; 50:20-23; 52:6-10. |
| EOG exercised such significant control over Snead's schedule that doing other work was practically impossible. Mot. at 14. | EOG did not exercise control such that performing other work was practically impossible. Snead did perform other work. Depo. Snead 149:20-151:3. He also had the discretion and ability to do so. Dec. Sanders ¶ 9. |
| EOG provided Snead with his invoice form. Mot. at 6. | EOG did not require Snead to use any particular template for his invoices. Neither Bobby Sanders or Jake Morrison provided Snead with the invoice template that he used. Depo. Snead at 89:13-23; Depo. Sanders at 148:8-14; Dec. Sanders ¶ 18. |
| EOG provided training to Snead. Mot. at 5. | EOG did not provide substantive training to Snead on how to perform his job duties. Depo. Morrison at 114:24-115:18; 117:8-14; 118:1-18; Dec. Daniel ¶ 12. The contractors trained each other. *Id.* Any other training that was offered to Snead was not substantive, optional, and available to anyone who performed services for EOG. Depo. Morrison at 114:24-115:18; Dec. Sanders ¶ 11. |
| Snead had no ability to negotiate his pay or MSA. Mot. at 14, 30, 31. | Snead had the ability to negotiate his pay and the MSA. Dec. Sanders ¶ 14. His MSA was modified when EOG waived the workers' compensation requirement. *Id.* Other independent contractors have also negotiated both. Deposition of Gordon Goodman at 95:17-96:6 (hereinafter "Depo. Goodman"), attached as Ex. U. |
| Snead did not subcontract out his work. Mot. at 14. | Snead often forwarded his phones to other contractors to cover his work. Dec. Sissell ¶ 6. EOG did not require Snead to seek permission to do so. Depo. Sanders at 150:20-23; Depo. Morrison at 124:2-11. |
| Snead's pay varied week to week. Mot. at 19. | Snead's pay was consistent week to week as evidenced by his invoices. *See* Ex. K; Ex. P. |
| Snead was paid only for the days he worked. Mot. at 19. | Snead was paid for days he did not work. Dec. Sissell ¶ 6; Ex. O. |
| Snead was not guaranteed a regular fixed rate. Mot. at 19. | Snead was guaranteed a minimum fixed rate of $2,100 based on the fact EOG offered him seven days of work. Dec. Sanders ¶ 22. |
| Snead's truck rate was intended to compensate him for answering phone calls from the well sites. Mot. at 22. | Snead's truck rate was to compensate Snead for maintenance on his vehicle and travel to and from the office. Depo. Sanders 41:4-18; 146:23-147:1. |

## SUMMARY JUDGMENT STANDARD

Summary judgment is unavailable when there is a genuine dispute as to a material fact, i.e., a fact is genuinely in dispute if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there is a genuine issue of material fact precluding summary judgment, the court is required to view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.  *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 471 (5th Cir. 2010); *Fernandez v. Transp. Designs*, No. 16-022, 2017 WL 1283102, *2 (W.D. Tex. Feb. 21, 2017) (Garcia, J.,) (discussing standard).

## AUTHORITIES AND ANALYSIS

I.    **Genuine Issues of Material Fact Preclude Summary Judgment on Whether Snead Was Properly Classified as an Independent Contractor.**

  a.    **The Dispute About Whether Snead Is an Independent Contractor or an Employee Involves Questions of Fact for the Jury.**

Whether a worker is an employee or an independent contractor is determined under an "economic realities" test, which requires consideration of five non-exclusive factors: (a) the degree of control exercised by the alleged employer; (b) the permanency of the relationship; (c) the skill and initiative required to perform the job; (d) the extent of the relative investments of the worker and the alleged employer; and (e) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer. *Thibault v. Bellsouth Telecomms.*, 612 F.3d 843, 847 (5th Cir. 2010).

These factors are highly fact intensive, making the issue of proper classification particularly ill-suited for resolution by summary judgment.  *Herman v. Express Sixty-Minutes Delivery Servs., Inc.*, 161 F.3d 299, 305 (5th Cir. 1998) (explaining that the contractor question is "very fact intensive," and the "presumption" weighs in favor of submission of the question to the jury); *Branch v. CEMEX, Inc.*, No. 11-1953, 2012 WL 2357280, at *14 (S.D. Tex. June 20, 2012) (explaining that where conflicting evidence exists of contractor status, the "presumption" is to allow the jury to decide).

For instance, just slight variations in the facts can lead to different conclusions.  *Compare Thibault*, 612 F.3d at 846-49 (finding splicers were independent contractors), *with Cromwell v. Driftwood Electrical Contractors, Inc.*, 348 F. App'x 57, 61 (5th Cir. 2009) (finding splicers were employees).

Consistent with the fact intensive nature of the economic realities test, summary judgment is rarely granted on the question of classification.  *See, e.g., Faludi v. US Shale Solutions. LLC*, No. H-16-3467, 2017 WL 5969261, at *7 (S.D. Tex. Nov. 30, 2017) (denying cross-summary judgment because the motions "raise genuine issues of material fact with respect to the five factors the court is to consider in determining whether the plaintiff is an employee or an independent contractor under the economic reality analysis, neither party is entitled to summary judgment"); *Eberline v. Media Net, LLC* ("*Eberline I*"), 68 F. Supp. 3d 619, 624, 626-27 (S.D. Miss. Dec. 2014) (denying summary judgment because of "genuine issues of fact regarding the nature and degree of control [defendant] maintained over [plaintiff's work]" and because of "questions of material fact" regarding the skill and initiative required for the job and the permanency of the relationship); *Barnes v. Abandonment Consulting Servs., L.L.C.*, No. 12-CV-01399, 2013 WL 12101068, at *5 (S.D. Tex. Aug. 5, 2013) (same); *Trahan v. Honghua Am., LLC*, No. 11-2271, 2013 WL 2617894, at *7 (S.D. Tex. June 10, 2013) (denying summary judgment because, among other reasons, "far too many issues of material fact remain, preventing the [c]ourt from determining what status the degree of control factor indicates").

Indeed, the very issue of independent contractor/employee status is the subject of a pattern jury instruction approved by the Fifth Circuit.  *See* Fifth Circuit Civil Jury Instructions at Instruction 11.26 FLSA—Employee or Independent Contractor, *available at* http://www.lb5.uscourts.gov/viewer/?/juryinstructions/Fifth/2014civil.pdf.  In fact, in the Committee Notes, the Fifth Circuit expressly states "for FLSA and other cases in which there are disputes about whether the plaintiff is an employee or an independent contractor.  **Such disputes are usually questions of fact for the jury**."  *See id.* at Committee Notes (emphasis added).  This Court previously stated in an earlier

ruling in this case that "the ultimate question of Plaintiff's status, a legal question whose fact-intensive and case-specific nature makes it ill-suited to summary resolution." Doc. 21 at 3.

Here, EOG has raised genuine issues of material fact on each of the five factors—although EOG need only raise fact issues on some of the factors for summary judgment to be inappropriate. *See Murillo v. Coryell Cty. Tradesmen, LLC*, No. CV 15-3641, 2017 WL 2780750, at *13 (E.D. La. June 27, 2017) (denying summary judgment because non-movant raised fact issues on "at least three" of the economic realities factors); *Barnes*, 2013 WL 12101068, at *5 (denying summary judgment because non-movant raised fact issues on two of the five economic realities factors).

### b.     Subjective Intent Is Relevant.

As a preliminary issue, Snead directs the Court to cases holding that contractual designation of a worker as an independent contractor is "not controlling." Doc. 39 at 9-10. However, while not controlling, subjective belief as manifested in writing or elsewhere is very much a relevant and important consideration to whether the proper classification of the worker. The Fifth Circuit thus expressly includes a jury instruction on the issue (as the sixth factor). *See* Fifth Circuit Civil Jury Instructions at Instruction 11.26 FLSA—Employee or Independent Contractor (emphasis added), a*vailable at* http://www.lb5.uscourts.gov/viewer/?/juryinstructions/Fifth/2014civil.pdf.     Courts within the Fifth Circuit agree that designation in a written agreement is an important consideration. *See Eberline I*, 68 F. Supp. 3d at 622-23 (considering the parties' written agreement); *Gate Guard Services L.P. v. Solis*, No. V-10-91, 2013 WL 593418, at *11 (S.D. Tex. Feb. 13, 2013) (considering the contractual designation of plaintiffs); *Mack v. Talasek*, No. V-09-53, 2012 WL 1067398, at *7 (S.D. Tex. Mar. 28, 2012) (considering the parties' contractual designation of independent contractor).

It is not surprising that Snead wants to turn a blind eye to the six separate written agreements he entered into with EOG—each which expressly state that he is an independent

contractor.  *See generally* Mot. at 1-8; *see* Ex. R; Ex. S; Ex. T.  Snead himself states that he would not have signed the agreements if he felt like they were inaccurate.  Depo. Snead at 81:1-14; 85:16-86:4.

At a minimum, these agreements must be considered, and the record contains evidence sufficient for a reasonable jury to conclude that these agreements show the parties' intent, which although not controlling, is nevertheless important.  *Honghua*, 2013 WL 2617894, at *11.

      c.      **There Is At Least a Material Fact Issue on Whether EOG Did Not Control Snead's Work.**

"While no single factor determines the outcome [of the economic realities test], the extent of the right to control the means and manner of the worker's performance is the most important factor."  *See* Fifth Circuit Civil Jury Instructions at Instruction 11.26 FLSA—Employee or Independent Contractor (emphasis added), *available at*  http://www.lb5.uscourts.gov/viewer/?/ juryinstructions/Fifth/2014civil.pdf.  Contrary to Snead's contention, the summary judgment evidence shows that a reasonable jury could conclude that EOG did not control Snead's work.  For example, Sanders expressly told Snead that he "had a lot of flexibility to do what he wished to do."  Depo. Sanders at 39:13-25; *see, e.g.*, *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 146 (2d Cir. 2017) (affirming district court's determination that truck drivers were independent contractors and collecting cases to support the fact that the truck drivers set their own schedules, including when, where, and how often to work, weighed in favor of independent contractor status); *Roslov v. DirecTV Inc.*, 218 F. Supp. 3d 965, 976 (E.D. Ark. 2016) (explaining that "[a]side from quality control guidelines, [defendant] did not sufficiently control [plaintiff's] daily activities," explaining that plaintiff "had flexibility throughout his day," which included, among other things, the decision on whether to work "at home or in the field"); *Donovan v. John Jay Esthetic Salons, Inc.*, No. 81-1565, 1983 WL 2114, at *3 (E.D. La. 1983) (concluding that hairdressers, cosmetologists, and manicurists were independent contractors under the FLSA in part because they enjoyed flexibility in setting their own schedules and determining their own routine).

Snead did not have to get EOG's permission to forward his phone calls and other work to other contractors if he did not feel like working. Depo. Sanders at 150:20-23. There is also disputed facts on Snead's claim and evidence (Mot. 6, 15) that EOG required Snead to be in the office Monday through Friday. *Id.* at 40:1-7 ("Q. Did you expect him to come to the office Monday through Friday? A. No.").

In addition to Sanders' testimony, Snead's social media pictures make evident the lack of control that EOG exercised over where and when Snead performed his work. As an example, Snead invoiced EOG for a full day of work while attending football games and music festivals on the same "work day." *See* Ex. C. On other occasions, Snead invoiced EOG for a full day of work while playing golf and vacationing in California on the same "work day." *See id.* Put simply, EOG lacked control over how, when, and where Snead performed his job.

Snead attempts to paint a picture that EOG controlled Snead's job because there was an EOG approved vendor list, certain mechanisms for adding a vendor to the list, and in certain instances a tiered order of vendors to call. Mot. at 12-13. But this too narrow interpretation of control is refuted by the law. *See Thibault*, 612 F.3d at 847 (affirming the district court's determination that the plaintiff was an independent contractor when the defendants assigned the plaintiffs to specific work assignments, provided blueprints for the work, and required the plaintiff to work certain days and hours, but provided only occasional supervision and never specified how a the work was to be done); *see also Eberline v. Media Net, LLC ("Eberline II")*, 636 F. App'x 225, 227 (5th Cir. 2016) (considering for the control factor: the plaintiff's ability to come and go as he pleased from the job site, that the jobs had minimal supervision, and that the plaintiff was able to determine how many days he worked, which days he worked, and what time slots he was available to work); *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993) (considering the defendant's control

over the plaintiff's schedule, the timing of their breaks, the determination of compensation, and the control over details of the work performed).

Moreover, Snead submits to the Court a copy of the "approved disposal sites," which is not the same thing as the approved vendor list used by Snead.  *See* Pls' Ex. 31.  The approved vendor list is hundreds of pages long and exists solely to ensure that vendors meet the requirements of EOG's master services agreement.  *See* Ex. A-2; *see* Dec. Sanders ¶ 17.  In addition, Snead testified himself that "[d]epending on which job it was," he did have discretion to decide which vendor to use (Depo. Snead at 60:15-61-8) and that in **70% of his jobs** he had the discretion to use whichever vendor he felt was best suited for the job.  Depo. Snead at 63:4-25.  Snead attempts to point to Morrison's deposition testimony to show EOG's control (Mot. at 13), but a reasonable jury could conclude the opposite, because Morrison testified that it was in "[Snead's] discretion to call who he needed to call."  Depo. Morrison at 118:9-119:8.  In addition, if Snead wanted to add a vendor to the list, he could submit the information to EOG for inclusion, which further demonstrates Snead's freedom to do the job.  Depo. Sanders at 181:24-182:9.

At a minimum, there are disputed material facts regarding the degree of control over Snead's work.  Sufficient evidence exists that a reasonable jury could find that Snead had the discretion and control over how and where to perform his job.

> **d.**     **Snead Failed to Establish Undisputed Facts Regarding the Skill and Initiative for the Job.**

The record contains sufficient evidence for a reasonable jury to conclude that Snead's position required skill, experience, and initiative like an independent contractor.  First, Snead's conclusion that the position required no skill or experience because "EOG controlled" Snead's job and left him with little discretion is disputed.  Mot. at 13.  As explained above, genuine issues of material fact exist as to the level of control over Snead's work.

Second, contrary to Snead's argument that he had "limited experience in the oil and gas industry" (Mot. at 7), EOG's summary judgment evidence establishes otherwise.  That evidence includes that before contracting with EOG, Snead worked in oilfield logistics for two different companies—Plains Exploration and Production and Stevens Tanker.  Depo. Snead at 29:14-18; 31:4-32:4; 50:20-23.  Stevens Tanker is one of EOG's vendors that delivers services to rig sites, and Snead himself felt like it was his successful handling of EOG's logistics from the vendor-side that made EOG contract with him.  *Id.* at 52:6-10.  To now claim that Snead had limited experience or skills in logistics is disingenuous at best.

Third, Snead appears to argue that there is no skill or experience required for the position because Sanders "recalls more about Plaintiff's football career from his interview than his actual qualifications."  Mot. at 13.  Snead is asking this Court to ignore the common sense reality of interviews, which can focus less on qualifications and more so on whether there is a personality fit. But more troubling, Snead is asking the Court to completely disregard ***why*** Snead was even selected for the interview—EOG needed an individual who already had the experience, skillset, and understanding of oilfield logistics.  Dec. Sanders ¶ 13; Depo. Sanders at 209: 2-12 ("Q.  In deciding to contract with Mr. Snead . . . Did you know how many years in business he had been?  A. I knew he had previously worked with water trucks and vacuum trucks at Stevens.").

At a minimum, genuine issues of material fact exist as to the level of skill and experience needed for the job and whether Snead was contracted with because he had the requisite skill and experience.  There is sufficient evidence for a reasonable jury to conclude that (a) Snead had a specialized skillset in oilfield logistics; (b) Snead's experience, especially the skillset he gained from one of EOG's vendors, is the reason EOG contracted with Snead and necessary for the job; and (3) EOG gave Snead the flexibility and discretion to perform the job in the manner he deemed best.

e.      **Snead Failed to Establish Undisputed Facts As to the Exclusiveness of his Position.**

There are also disputed facts concerning the issue of the permanence of Snead's job. Snead's own self-serving characterization of the permanency of his position disregards testimony regarding the nature of his position—that it was contingent on the development of Eagle Ford, Snead could provide services to other companies, and Snead could terminate the relationship at any time. Dec. Sanders ¶ 9.

Sanders testified that one of the reasons why he classified Snead as a contractor was because "[t]hese positions are generally temporary in nature, and they move with the activity levels of the company." Depo. Sanders at 45:21-25; *see also id.* at 223:2-18 ("Q. When you say the activity levels warranted it, what do you mean by that?  A. The drilling levels, workover levels, just the overall oil and gas activity in the field. It wanes and  declines with commodity prices in other fields."); *see also* Dec. Daniel ¶ 3 ("Jake told me that I should not spend all my money, because the work would not be permanent.  It would end when EOG started to pull back its work in the Eagle Ford."). Snead was free to end his contract with EOG at any time.  Dec. Sanders ¶ 9.  Snead was also free to perform services for other companies while he contracted with EOG like Upper Deck.  *Id.*; Depo. Snead 149:20-151:3.

Courts have recognized that this factor does not weigh in favor of employee status when the contractor and a company have the option to terminate the contractor agreement at any time and decide not do so over an extended period of time.  *Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir. 1983) (holding that although the plaintiff had performed services for the company for ten years, he was capable of terminating the relationship in thirty days' notice and therefore did not have such a high degree of permanency such that he should be considered an employee); *Saleem v. Corp. Transp. Grp.*, 52 F. Supp. 3d 526, 542-43 (S.D.N.Y. 2014); *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 610 (E.D.N.Y. 2012) (noting that the plaintiffs' attempt to cast the relationship as permanent was

unavailing because the contractual relationship was terminable at any time by either party); *Molina v. S. Florida Exp. Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1287 (M.D. Fla. 2006) (noting that the permanency of the relationship factor weighed in favor of independent contractor status because the independent contractor agreement was terminable upon twenty-four hour notice). Here, Snead was free to stop working for EOG at any time (Dec. Sanders ¶ 9) and did just that in August 2016. *Id.*

Moreover, courts have held that a longer working relationship does not weigh in favor of employee status when there is "little incentive" to go work for competitors. *Herman v. Mid-Atlantic Installation Services, Inc.*, 164 F. Supp. 2d 667, 676-77 (D. Md. 2000) (noting that the plaintiffs' deposition testimony revealed there was "no real incentive or time to work for competitors [b]ecause [defendant] generally had full assignments for the [plaintiffs], and there was no reason to switch from one broker to another or to work for more than one at any given time"). Similarly, Snead had little incentive to find other work because EOG had "full assignments" that needed contract work.

At a minimum, genuine issues of material fact exist as to the permanency of Snead's working relationship, and sufficient evidence exists that a reasonable jury could conclude the relationship was temporary. *See Eberline I*, 68 F. Supp. 3d 619 at 627 ("It is possible that although [plaintiff] was permitted to work for others, he was in actuality unable to do so for substantial periods of time because of his work for [defendant]. The evidence conflicts on this point, and therefore summary judgment is inappropriate."); *see also Renteria-Camacho v. DirecTV, INC.*, No. 14-2529, 2017 WL 4619354, at *4 (D. Kan. Oct. 16, 2017) (finding fact issues existed on the permanency factor when "plaintiff could have sought other work . . . but he apparently did not").

### f.      Snead Failed to Establish Undisputed Facts Regarding the Relative Investments of Snead and EOG.

Snead's statement that "no investment" was required on his behalf is disputed and simply incorrect. Mot. at 13. The record contains evidence to the contrary. Notably, Snead paid for his

two primary tools—his cell phone and vehicle.  Depo. Snead 60:7-14; 76:16-24.  Although EOG waived the workers' compensation insurance requirement, Snead was still required to purchase other insurance policies for himself.  Depo. Snead 88:1-89:5.  EOG even sent Snead notice when his insurance lapsed, telling him that he should not be performing work for EOG without the required insurance policies.  *Id.*

Snead also invested in his home office, deducting from his taxes home office expenses in the amount of $3,297.  Depo. Snead 131:14-25; *see also* Ex. M.  In fact, for the one year of available tax returns, Snead claimed over $33,504 for depreciation in his tools and for expenses.  *See* Ex. M.  Put simply, Snead made investments in himself as a contractor.

Snead also ignores the fact that use of an EOG office and office supplies was optional.  EOG offered it as a convenience, and it was Snead's decision to use the office and supplies.  Dec. Sanders ¶¶ 20-21; *see also* Dec. Daniel ¶ 13.  Snead attempts to argue that EOG's "operational costs" for office space, computers, telephone land lines, and supplies exceeds Snead's investments and therefore Snead is an employee.  Mot. at 13.  But this argument is a red herring, an attempt to focus on EOG's investment in its business as a whole.  Adopting this theory effectively makes every company that invests in an office space the employer of any contractor who may work in the building—an absurd result—this is why the inquiry is the ***relative*** investment of both parties to the ***specific job*** at issue.  *Gate Guard*, 2013 WL 593418, at *7 (explaining that the Fifth Circuit has instructed courts not to "focus on the 'overall investment' by [defendant], but should instead 'compare [] the amount the alleged employer and employee each contribute to the specific job the employee undertakes'").

Examining the relative investments for Snead's specific coordinator job reveals a disputed record that contains sufficient evidence from which a reasonable jury could conclude that Snead's relative investment was greater than EOG's.  *Barnes*, 2013 WL 12101063, at *5 (denying summary

judgment because of fact issues regarding the extent of plaintiff's investment when plaintiff testified that defendant provided him an office, desk, chair, and various other office supplies on the rig site and reimbursed plaintiff for use of his cell phone, but defendant introduced evidence that it required plaintiff to provide his own cell phone, computer, postage, and safety equipment); *see also Carrell*, 998 F.2d at 333-34 (finding plaintiffs were contractors because they purchased some of their own equipment even though the defendant also provided some tools).

      **g.**     **Contrary to Snead's Motion, the Evidence Shows Snead Had the Opportunity to Earn a Profit or Loss.**

The record also contains sufficient evidence from which a reasonable jury could conclude that Snead had the opportunity to earn a profit or loss. The facts of *Gate Guard Services LP v. Solis* are illustrative. In *Gate Guard*, independent contractors were working as gate guard attendants at well sites. 2013 WL 593418, at *1-2, 4. As the court explained, "[plaintiffs'] actual work duties of signing people in and out only takes a few hours per day. . . [they] do not work a required schedule that precludes extra work." *Id.* at *8. The court also explained that plaintiffs could "increase their profits—or potentially suffer a loss—based upon use of relief workers." *Id.* Importantly, the court examined the expenses claimed on plaintiffs' tax returns, noting that plaintiffs deducted business-related expenses, which allowed them to "increase their profits by controlling their costs." *Id.* at *9.

The same holds true here. Snead's contention that EOG exerted so much control over his schedule such that he was unable to perform services for any other company and earn additional profit is disputed. Depo. Sanders 39:13-25; 150:20-23. On the contrary, Snead's actual work duties only took a few hours per day (*see* Ex. C, Instagram photos) and Snead earned additional compensation from Upper Deck during the time period he contracted with EOG. Depo. Snead 149:20-151:3.

Moreover, like the plaintiffs in *Gate Guard* with relief workers, Snead had the opportunity to earn more profit or take a loss by how often he forwarded his phone calls—a decision only Snead

could make.  *See* Depo. Sanders at 150:20-23.  Snead also had the option of driving to EOG's office, which allowed him to charge a truck rate.  Dec. Sanders ¶ 23; Depo. Sanders 146:23-147:1. Similarly, Snead had the ability to increase his profits by controlling his costs and deducting certain expenses from his federal tax returns.  *See, e.g.*, *Thibault*, 612 F.3d at 846 (noting that plaintiffs "increased profits by controlling costs" and making deductions on tax returns); *Gate Guard*, 2013 WL 593418, at *9; *Mack*, 2012 WL 1067398, at *3-4.  Based on the record evidence, a reasonable jury could conclude that Snead had the opportunity to earn a profit or loss and, as a result, summary judgment is improper.

In total, at a minimum, genuine issues of material fact exist as to several if not all of the economic realities factors and, as a result, the Court should deny summary judgment.[2]

## II.   EOG Has Presented Evidence Sufficient for a Reasonable Jury to Conclude that EOG Paid Snead on a Salary Basis.

Even if Snead was an employee of EOG, which he was not, Snead was exempt from overtime pay under the FLSA.  Despite the "remedial nature of the FLSA, not all workers require the same kind of protection" under the statute.  *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1187 (10th Cir. 2015).  Employees employed in a bona fide executive, administrative, or professional capacity are exempt from the FLSA's overtime requirements.  29 U.S.C. § 213(a)(1).

Similarly, highly compensated employees who perform at least one of the duties of an executive, administrative, or professional employee are also exempt from overtime.  29 C.F.R. §

---

[2] EOG disputes Snead's contention that EOG regularly used documents that referred to Snead as an "employee" and regularly invited Snead to employee events.  Mot. at 3, 5.  The evidence shows that Sanders or Morrison did not create these documents.  Depo. Sanders at 162:15-163:4; Depo. Morrison at 67:20-68:24.  In fact, Sanders testified that he never even accessed the referenced document for business purposes.  Depo. Sanders at 162:15-163:4.  Morrison testified that he had a problem with the document title because "[i]t's not an employee list.  It's a consultant list."  Depo. Morrison at 80:18-81:7.  Similarly, Sanders stated that he did not have any communications with anyone regarding whether independent contractors in the SSG should be invited to company events. Depo. Sanders at 175:6-22.  These employee events were not routine and contractors were not always invited.  *Id.* at 172:14-25.

541.301(b)(3). Under these exemptions, EOG must prove at trial that Snead meets both a "salary" and "duties" test. *Cowart v. Ingalls Shipbuilding, Inc.*, 213 F.3d 261, 262-63 (5th Cir. 2000). Snead does not move for summary judgment on the duties test because Snead knows that genuine issues of material fact exist as to Snead's duties that a jury must decide. Snead moves for summary judgment on the salary basis only. Mot. at 16-20. To prevail, Snead must prove that there an "absence of evidentiary support" in the record for application of the exemption. *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 358 (5th Cir. 2010). Because there is sufficient record evidence for a reasonable jury to conclude that Snead's compensation was a salary, and because Snead's reliance on this Court's recent decision in factually distinguishable *Keen v. DXP Enters.*, No. 15-cv-137, 2016 WL 3253894 (W.D. Tex. June 6, 2016) is misplaced, Snead's motion should be denied.

### a. Genuine Fact Issues Exist as to Whether EOG Paid Snead on a Salary Basis.

#### (i) *Section 541.602(a) Focuses on the Amount Received.*

The salary basis test is a creation of the DOL in its regulations. 29 C.F.R. §§ 541.602 and 541.604; *see Auer v. Robbins*, 519 U.S. 452, 461-62 (1997) (explaining that "the salary-basis test is a creature of the Secretary's own regulations"). The relevant regulations state that an employee must be "compensated on a salary or fee basis at a rate of not less than $455.00 per week." 29 C.F.R. §§ 541.100, 541.200, 541.300, 541.601.

Two sections provide further explanation of what it means to be paid on a salary basis—Section 541.602(a) and 541.604(b). Section 541.602(a) provides that:

> An employee will be considered to be paid on a "salary basis" within the meaning of the regulations if the employee *regularly receives* each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of work.

29 C.F.R. § 602(a)(emphasis added). In addition, although deductions from a salary are generally prohibited, the regulations provide for certain instances where deductions are allowed. For instance,

"[d]eductions from pay may be made when an exempt employee is absent from work for one or more full days for personal reasons."  29 C.F.R. § 602(b)(1).  In making such a deduction, an employer may "use the hourly or daily equivalent of the employee's full weekly salary or any other amount proportional to the time actually missed by the employee."[3] *Id.* § 602(c).

Snead interprets Section 541.602(a) to suggest that a day rate can never meet the salary basis test, but that is not true.  EOG need not call the payment a "salary."  Case law establishes this much. *See Valcho v. Dall. Cnty. Hosp. Dist.*, 658 F. Supp. 2d 802, 809 (N.D. Tex. 2009) (explaining plaintiff's compensation could still qualify as a salary even though it was calculated hourly); *see also Souza v. Sunbelt Auto Grp., Inc.*, No. 09–CV–1103, 2010 WL 1381894, at *2 (D. Ariz. April 6, 2010) ("An employee may be labeled as hourly in the employer's books and yet actually qualify as salaried.").

Under the plain language of Section 602(a), EOG need only to ensure that the employee ***regularly receives*** each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation that is not subject to reduction because of variations in the quantity of work.  *See Anani v. CVS RX Services, Inc. ("Anani I")*, 788 F. Supp. 2d 55 (E.D.N.Y. 2011) ("[T]he agency's use of the word 'predetermined' to describe the salary requirement indicates only that this element of an employee's compensation must be both fixed and determined prior to the period in which it would apply.").

The evidence shows that EOG guaranteed Snead a weekly payment of at least $2,100, and he did in fact receive that amount.  Dec. Sanders ¶ 22; Ex. K; Ex. P.  As other courts within the Western District of Texas have recognized, this evidence precludes summary judgment.  *See Wilson v. Sys. & Processes Eng'g Corp.*, No. 10-CA-160-SS, 2010 WL 11575616, at *4-5 (W.D. Tex. Oct. 28, 2010) (Sparks, J.) (explaining that one "main area of contention between the parties is whether [plaintiff] was paid a predetermined amount regardless of quantity or quality of work" and

---

[3] The regulation also explain that "[a]n employer is not required to pay the full salary in the initial or terminal week of employment." 29 C.F.R. § 541.602 (b)(6).

emphasizing that although plaintiff's payroll showed that he regularly received a predetermined amount, there was some "ambiguity" such that summary judgment was inappropriate because there must be an "opportunity to assess the credibility of the parties"); *Anunobi v. Eckerd Corp.*, No. 02-CV-0820, 2003 WL 22368153, at *4-5 (W.D. Tex. Oct. 17, 2003) (Rodriguez, J.) (finding that plaintiff was paid on a salary basis because plaintiff's "payroll data proved that Plaintiff was paid a fixed sum every week" and the fact there were some internal accounting changes "does not alter the conclusion that Plaintiff regularly received each pay period a predetermined amount constitution all or part of his compensation").

Therefore, there is at least a fact issue from which a reasonable jury could find that EOG paid Snead on a salary basis. Snead ***regularly received*** on a bi-weekly basis a ***predetermined*** sum that far exceeded the $455.00 minimum and which was not subject to reduction because of variations in the quantity of work. *See* Dec. Sanders ¶ 24; Ex. K; Ex. P. Snead's pay was not improperly reduced based on the quantity of his work—he was paid whether he answered one phone call or ten phone calls. *See* Depo. Sanders at 40:10-15; 41:23-42:11. Any deductions were for entire days where Snead performed no work, which is permissible under the FLSA. Dec. Sanders ¶ 24; *see Cowart*, 213 F.3d at 265 (explaining that an employer can deduct a full day from an employee's salary so long as a full day's pay is not deducted when an employee misses a half day of work).

     *(ii)*     *Section 541.604(b) Permits EOG to Calculate Snead's Salary on a Daily Basis.*

Snead's compensation also qualifies as a salary under Section 541.604(b), which expressly states that an employee's salary may be computed on a daily basis:

> An exempt employee's earnings may be ***computed on an hourly, daily or a shift basis***, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned.

29 C.F.R. § 604(b)(emphasis added).   Snead argues that Section 541.604(b) does not apply here because even though Section 541.604(b) allows for a salary to be calculated on a daily basis, there was no "weekly guarantee of a fixed salary."  Mot. at 20-21.  But the existence of a "guarantee" of a weekly base compensation of $2,100 is disputed here.  Snead admits that it is undisputed that EOG hired Snead to work seven days a week.  Mot. at 15; *see also* Ex. Q.  In addition, Snead's pay records show that he consistently received the same amount of base and total compensation each pay period.  *See* Ex. K; Ex. P.  Sanders testified that one of the reasons he switched terminology to "weekly rate" in 2016 was to clarify the existing pay practice and that Snead's weekly rate would have been at least $2,100.  Depo. Sanders at 95:1-8; Dec. Sanders ¶ 28.

In addition, EOG need not establish that Snead's actual compensation was reasonably related to his minimum weekly salary because Snead was highly compensated.  *See Anani v. CVS RX Services, Inc.* ("*Anani II*"), 730 F.3d 146 (2d Cir. 2013).  In *Anani II*, the U.S. Court of Appeals for the Second Circuit held that the payment of a weekly salary with actual pay based on some other variable satisfied the salary basis requirement under 29 C.F.R. §§ 541.601 and 541.604, and that it is not necessary for actual compensation to bear a reasonable relationship to the minimum weekly salary for highly compensated employees.  *Id.* at 149-150.  Moreover, *Anani II* goes even further to suggest that earning more than $100,000 not only relaxes the duties requirement of exemptions, but also relaxes the salary requirements.  *Id.* at 150 ("Appellant's sole argument regarding C.F.R. § 541.601 is that it is intended only to provide a relaxed standard as to determining the duties requirements for employees who earn over $100,000.  However, that reading is unsustainable.  First, the regulation is found in the 'Salary Requirements' Subpart rather than in the 'duties requirements' Subparts, and there is direct evidence that this placement was not the result of administrative inadvertence.").

At a minimum, there is a genuine dispute about whether EOG *guaranteed* Snead a weekly minimum salary that was calculated on a daily basis.  *See Cator v. DXP Enters., Inc.*, Report and Recommendation at 20, No. 15-cv-00179 (W.D. Tex. May 19, 2016) (ECF 29) (denying summary judgment and finding fact issues remained on, among other things, whether  plaintiff was really "guaranteed" a minimum of at least $455 per week for the weeks that he worked; whether plaintiff had a clear expectation regarding the amount of pay he would receive each week based off his seven-day schedule; and whether plaintiff's expected pay amount was "predetermined"); *Wellman v. Grand Isle Shipyard, Inc.*, No. 14-831, 2015 WL 2169786, at *3 (E.D. La. May 8, 2015) (finding fact issue because there was conflicting evidence when plaintiff presented affidavits, payroll, and "employee confirmation" sheets that make no mention of a salary versus a declaration by a project manager who stated he was verbally told at the time of his hire that he would receive at least 40 hours of compensation per week).

### b.    Plaintiff's Cases Are Not Applicable Here.

For support, Snead primarily relies on this Court's decision in *Keen v. DXP Enterprises, Inc.*, in which the Court granted plaintiff's motion for summary judgment, finding that the plaintiff's day rate did not satisfy the salary basis test.  No. 15-cv-137, 2016 WL 3253894 (W.D. Tex. June 6, 2016). But the facts here are different than those present in *Keen*.

In *Keen*, this Court placed significant emphasize on the following:  (1) no evidence raised a fact issue that plaintiff was guaranteed a weekly sum; (2) plaintiff's schedule was "customer driven" and "varied based on need"; (3) plaintiff's payroll showed that he almost never received the same amount of compensation per pay period; (4) plaintiff's payroll fluctuated substantially; (5) no evidence demonstrated that plaintiff was paid when he did not work; and (6) some weeks plaintiff was paid less than $455.  *Id.* at *3-5.

The record here is in stark contrast. Unlike the defendant in *Keen*, EOG guaranteed Snead a minimum sum of $2,100. Dec. Sanders ¶ 22. Snead's schedule did not "vary" or fluctuate, and Snead consistently received the same compensation each pay period. *See* Ex. K; Ex. P; Ex. Q. Snead also never earned less than $455 in any week that he worked. Ex. K; Ex. P. Moreover, there is evidence here that EOG paid Snead when he did not work. *Compare* Dec. Sissell ¶ 6, *with* Snead's July 5-7, 2015 Invoices, attached as Ex. O (invoicing EOG for July 5, 6, and 7, 2015).

Snead's reliance on *Hughes v. Gulf Interstate Field Services*, 878 F.3d 183 (6th Cir. 2017), which he filed separately from his summary judgment motion (Doc. 42) is baffling given that the U.S. Circuit Court of Appeals for the Sixth Circuit determined that *fact issues precluded summary judgment* on the salary issue, the exact argument that EOG is making here.

In *Hughes*, plaintiffs were paid on day rates in the amount of $337, earning an annualized compensation of more than $100,000. Doc. 42-1 at 3. Defendant introduced evidence that plaintiffs were "told orally that they would be working" six days a week, which defendant argued was a "guarantee" of a salary. *Id.* at 7. Plaintiffs introduced evidence that they were paid for only the days that they worked. *Id.* As a result, the court ruled: "Oral evidence submitted by [defendant] that contradicts written evidence submitted by [plaintiffs] may well weaken [plaintiffs] case, and perhaps it will convince a jury to find for [defendant]. But it does not extinguish the genuine issue of material fact here." *Id.* However, the Plaintiffs in *Hughes* were not allowed to set their own schedule. *Id.* at 2. Here, EOG guaranteed Snead work every day. *See* Dec. Sanders ¶ 22. The decision not to work was Snead's and only Snead's. *See* Depo. Sanders at 150:20-23. This factual distinction is important and lends itself to the existence of a guaranteed minimum compensation.

Snead's reliance on *Richard v. Mudtech Services* is unavailing given the lack of reasoning by the court as to why summary judgment was appropriate. No. 15-cv-3239, (S.D. Tex. Sept. 1, 2017)

(ECF No. 64).  Instead, *Richard* almost summarily concluded that the salary basis test is not met, without any explanation of why no genuine disputes exist in the record evidence.  *Id.* at 9.

The evidentiary record is more akin to *Akins v. Worley Catastrophe Response, LLC,* a case involving plaintiffs who worked as claims adjusters.  No. 12-2401, 2013 WL 1907486 (E.D. La. May 8, 2013).  Plaintiffs were paid $450 and then later $425 per day.  Def's Response in Opp. to Mot. Summ. J. at 9-10, No. 12-cv-02401, (E.D. La Apr. 30, 2013) (ECF No. 105).  Plaintiffs claimed that summary judgment was appropriate because a day rate did not satisfy the salary basis.

In response, defendant provided evidence that plaintiffs were paid bi-weekly wages that were computed on a daily basis with a minimum expectation of days worked and earnings.  Def's Response in Opp. to Mot. Summ. J. at 9-10, No. 12-cv-02401, (E.D. La Apr. 30, 2013) (ECF No. 105).  Defendant's evidence revealed that plaintiffs' standard schedule was "seven days per week and a minimum of 12 hours per day," and they were "expected to work a full schedule, meaning seven days a week."  *Id.*  Defendant's evidence also include that plaintiffs earned well in excess of $455 per week, with plaintiffs earning total annual compensation between $120,000 to $200,000.  *Id.* at 4-5. Defendant stated that it informed plaintiff it could expect a minimum weekly amount of "approximately $1,800 for those earning $450 per day."  *Id.* at 25.  On this record, the court held:

> [F]act issues are in dispute concerning whether plaintiffs were paid on a salaried basis, including but not limited to, whether plaintiffs were guaranteed a minimum of at least $455 per week for the weeks that they worked; whether plaintiffs regularly and actually received at least $455 per week for the weeks that they worked, with the exception of permissible deductions; whether some plaintiffs were paid their full rate and did not have their wages reduced based on the quantity of work when they did not work full days; whether plaintiffs had a clear expectation regarding the amount of pay they would receive each week []; whether that expected amount was a "predetermined amount"; whether plaintiffs' pay that was computed on a daily rate, but actually received on a weekly or less frequent basis, meets the salary basis test . . .

*Akins*, 2013 WL 1907486, at *4.  Because the evidentiary record is more similar to that of *Akins* and not *Keen*, summary judgment is inappropriate because sufficient evidence exists from which a reasonable jury could decide Snead was paid on a salary basis.  The reasoning applied by the Sixth

Circuit in *Hughes* rings true here—the evidence submitted by EOG contradicts the evidence submitted by Snead, and EOG's evidence "may well weaken [Snead's] case, and perhaps it will convince a jury to find for [EOG].  But it does not extinguish the genuine issue of material fact here."  Doc. 42-1 at 7.

III.    **Fact Issues Exist from which a Reasonable Jury Could Find that Snead's Compensation Warrants Application of the Half-Time Remedy.**

Assuming EOG is liable, which EOG vehemently denies, Snead argues that EOG cannot avail itself of the half-time overtime remedy because Snead was paid a truck rate in addition to his day rate.  Mot. at 21-24.  Snead's argument is based on a fundamental misinterpretation of 29 C.F.R. § 778.112.  To qualify for the half-time remedy under Section 778.112, Snead must (1) be paid by a flat sum for his work daily, regardless of the number of hours he worked; and (2) must not have received other forms of compensation for services.  29 C.F.R. § 778.112.  Snead does not appear to dispute the first requirement, but challenges the second requirement only.  In doing so, Snead incorrectly argues that the truck rate was compensation for services that prevents the application of Section 778.112.  Mot. at 23.

Here, Sanders unambiguously explains that the truck rate was compensation "for having a vehicle and maintaining the insurance on the vehicle and the cost of getting to and from our office."  Depo. 146:23-147:1.  This payment does not prevent application of the half-time remedy.  Courts have held that Section 778.112 applies when the payment is not for the same job duties.  *See Bunday v. Suncoast Beverage Sales, LLP*, No. 08-cv-00769, 2009 WL 10670167, at *6-7 (S.D. Fla. Sept. 18, 2009).  At the outset, there is no evidence that Snead was paid any other form of compensation other than $300 for his actual services of answering telephone calls. Although Snead received a $150 truck rate, the $150 payment was not to compensate Snead for answering the phone.  This much is made clear by Sanders's testimony.

In support of his position, Snead points to the two *Rodriguez v. Republic Services, Inc.* decisions, which involve a plaintiff who was paid $120 a day for the first five days of work and then an hourly rate on the sixth day of work.  No. 13-00020, 2013 WL 4054707, at *1 (W.D. Tex. Aug. 12, 2013).[4] In the *Rodriguez* cases, the court concluded that the work performed on the sixth day was no different than the work performed on the first five days of the week.  As a result, the court held that the hourly compensation on day six was an another "form of compensation for services" and therefore Section 778.112 was inapplicable.  *Id.* at *5.

But the reasoning applied in *Rodriguez v. Republic Services* is inapplicable here because the truck rate does not compensate Snead for the same type of services as the $300 payment.  Because the two payments are not for the same job duties, Section 778.112 applies.  *See Bunday*, 2009 WL 10670167, at *6-7.  To be sure, the fact that Snead received different payments in one day does not make § 778.112 inapplicable because case law allows different payments if the compensation was still paid per day.  *Powell v. Carey Int'l Inc.*, 514 F. Supp. 2d 1302, 1312–1318 (S.D. Fla. 2007) (finding that § 778.112 applied to drivers who were paid six different forms of compensation because each form of compensation was paid per job).

In addition, as the U.S. Supreme Court and the Fifth Circuit has emphasized in other contexts, the real inquiry for application of the half-time remedy is whether the worker had an understanding that the employer would pay a fixed compensation regardless of the number of hours worked.  *Overnight Transp. Co. v. Missel*, 316 U.S. 572, 581 (1942); *Ransom v. M. Patel Enter. Inc.*, 34 F.3d 377 (5th Cir. 2013).  In other words, if the worker has a clear and mutual understanding that his compensation was for all hours worked, then the worker has already been paid once for hours over forty and is therefore only entitled to a half-time remedy.  *Urnikis-Negro v. Am. Family Prop. Servs.*, 616

---

[4] The second decision was a result of a motion for reconsideration, which the court denied, upholding its first decision.  *Rodriguez v. Republic Servs., Inc.*, No. 13-cv-20, 2013 WL 5656129 (W.D. Tex. Oct. 15, 2013).

F.3d 665, 675 (7th Cir. 2010) ("The employer will separately owe the employee a premium for the overtime hours, but because he has already been compensated at the regular rate for the overtime hours by means of the fixed wage, the employer will owe him only one-half of the regular rate for those hours rather than time plus one-half.").  Here, it is undisputed that EOG and Snead agreed to pay Snead a fixed wage regardless of the number of hours worked.  Depo. Sanders at 40:10-15; 41:23-42:11.  Therefore, he has already been paid once for hours over forty.  Under this factual scenario where a worker was paid a fixed wage for all hours worked, the Supreme Court expressly held in *Overnight Transportation Company v. Missel* that the half-time remedy should apply to calculate any overtime liability.  316 U.S. at 581.

At a minimum, there exists two genuine issues of material facts on two topics that preclude summary judgment— (1) what the $150 was intended to compensate; and (2) whether the $150 was for different types of work.

## IV.    Snead Is Not Entitled to Summary Judgment on EOG's Good Faith Defense.

Snead's motion for summary judgment on good faith should be denied as premature because Snead has not established liability on his claim.  *See Lipnicki v. Meritage Homes Corp.*, No. 10-cv-605, 2014 WL 923524, at *12 (S.D. Tex. Feb. 13, 2014) ("There has not yet been a finding of any FLSA violations, so the good faith issue is one that may never need to be decided. . . . The Court therefore concludes that the good faith decision is better off being decided if it becomes necessary, when the Court will have the benefit of further factual development at trial.); *Gallegos v. Equity Title Co. of Am.*, 484 F. Supp. 2d 589, 599 (W.D. Tex. 2007) ("Whether [the employer] acted in good faith and with reasonable grounds for believing it acted in conformity with the FLSA must be determined at trial.").  Out of an abundance of caution, however, EOG responds as follows.

Snead incorrectly states that liquidated damages are "mandatory."  Mot. at 25.  Instead, an award of liquidated damages is within the discretion of the Court.  *Casey v. Livingston Parish Commc'ns*

*Dist.*, No. 07-30990, 2009 WL 577756, at *6 (5th Cir. Mar. 6, 2009).  The good faith inquiry has both a subjective and objective good faith component.  *Cordero v. Voltaire, LLC*, No. A-13-CA-253-LY, 2013 WL 6415667, at *9 (W.D. Tex. Dec. 6, 2013).  Here, it is undisputed that EOG subjectively acted in good faith.  *See* Depo. Sanders 45:21-25; Depo. Goodman at 94:16-95:4; 96:10-23.

There is also at least some evidence that EOG objectively acted in good faith.  First, the evidence is disputed on the actions Sanders took to determine how to classify Snead.  Mot. at 31-32.  Snead argues that Sanders in effect did nothing (Mot. at 32-33), but the record contains evidence that Sanders assessed "the work that's being performed" and whether it was part of EOG's "core business."  Depo. Goodman at 102:20-104:12.  Sanders also looked at the flexibility and freedom of the position and whether EOG was controlling the details of the work—a fact which both parties dispute.  *Id.*  Therefore, Sanders **_did_** make an assessment on how to classify Snead.

Second, EOG relied on the six total agreements that Snead signed during the time period he provided services to EOG.  Ex. R; Ex. S; Ex. T.  To be sure that Snead understood and agreed to the contractor relationship, EOG continually provided Snead with these documents.   EOG provided Snead with the agreements before he started contracting in December 2013, approximately 15 months later in March 2015, and then again seven months later in October 2015.  Ex. R; Ex. S; Ex. T.  EOG repeatedly asked Snead to consult with an attorney if he had any concerns about whether the parties satisfy the requirements for an independent contractor relationship.  Ex. S; Ex. T.  Snead chose not to.  Depo. Snead 85:20-86:4.  This evidence—while not dispositive—certainly supports a finding that EOG acted in good faith.  To hold otherwise essentially rules that written agreements carry no force or effect and parties are free to disregard their promises.

EOG disputes Snead's statement that he was not able to "negotiate" his MSA and had "no option but to sign the MSA if he wanted to work for EOG."  Mot. at 29-30.  To the contrary, the evidence shows that independent contractors **_can_** and **_have_** negotiated MSAs.  Dec. Sanders ¶ 14;

Depo. Goodman 95:17-96:6 (explaining that "there have been cases where that MSA has been – points of it have been negotiated, where a contractor doesn't like part of it. So even though, yes, he had to sign it, it's just part of the work requirement and setting the standards for working for EOG"). The fact that Snead did not negotiate his MSA (just like he did not consult an attorney when instructed) does not mean EOG acted in bad faith.[5]

Third, EOG followed the industry standard of using contractors. Depo. Goodman at 96:10-23. EOG disputes Snead's statement that "EOG can put forth no evidence beyond the amorphous allegations that use of contractors and paying a day rate is common to the oil and gas industry." Mot. at 30. EOG need not look very far for such evidence than to Snead himself. Before providing services to EOG, Snead admits that he worked as an ***independent contractor paid on a day rate basis while providing oilfield logistics services*** with another oil and gas operator, Plains Explorations & Production. Depo. Snead at 29:14-18; *id.* at 31:1-32:4 ("Q. How were you paid? Were you paid on a day-rate basis? A. That was day rate, yes."). Snead also previously worked as an ***independent contractor*** petroleum landman. *Id.* at 20:12-18; 24:16-18. Snead also agrees that many individuals in the oil field are contractors. *See id.* at 37:25-41:10.

Although courts are conflicted on the extent to which a defendant can rely on industry standard to establish the good faith defense, it is nevertheless a consideration that establishes EOG objectively acted in good faith. *See Harris v. HKA Enters., Inc.*, No. 06-2125, 2008 WL 906314, at *3 (E.D. La. Mar. 31, 2008) (finding that liquidated damages were not appropriate where the employer argued it relied, in part, on industry standard in making classification decisions); *see also Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 937-38 (S.D.N.Y. 2013) (same); *Bennett v. SLT/TAG, Inc.*, No. CV-02-65, 2003 WL 23531402, at *9-10 (D. Or. May 8, 2003) (same).

---

[5] Snead's focus on the MSA's indemnification clause as "bad faith" is misguided. Contrary to Snead's argument, there is legal authority for such a clause. *Costello v. BearEx, Inc.*, No. 12-C-7843, 2013 WL 2156052 (N.D. Ill. May 17, 2013); *Dobbins v. Scriptfleet*, No. 11-cv-1923, 2012 WL 2282560 (M.D. Fla. June 18, 2012); *Spellman v. Am. Eagle Express*, 680 F. Supp. 2d 188, 191-92 (D.D.C. 2010).

Fourth, during the time period in which Snead contracted with EOG, Snead never complained or informed EOG that he disagreed that he was an independent contractor or informed EOG that he believed he should be receiving overtime.  Depo. Snead 82:24-83:8.  Nor did EOG receive complaints from any other contractor working under SSG.  Dec. Sanders ¶ 29.  As a result, EOG had no objective reason to believe it was not acting in good faith.

Fifth, EOG disputes that it had "no legal guidance" on whether it was properly classifying Snead.  In January 2016, which is during the time period Snead provided services to EOG, the Texas Workforce Commission ruled in the *Decision of the Commission Involving the Tax Liability of Extech Consulting, LLC* that EOG was properly using contractors.  *See* Def's Answer to No. 7, Pl's Second Set of Interrogatories, attached as Ex. V.  Although Snead's job position was different, EOG treated Snead similarly as the contractors in *Extech* because EOG did not set Snead's hours and was only interested in the end result.  *Id.*  As a result, EOG felt comfortable with its classification of Snead. *See id.*  In sum, if reached, genuine issues of material fact exist as to whether EOG acted in good faith in its classification of Snead, precluding summary judgment on EOG's affirmative defense.

## V.    Snead Is Not Entitled To Summary Judgment on His Claim that EOG Acted Willfully, Extending the Damages Recovery to Three Years.

Damages under the FLSA are limited to two years unless the plaintiff can establish a willful violation in which case recovery includes a third year.  29 U.S.C. § 255(a).  Snead bears the burden to establish that EOG's conduct was a willful violation of the FLSA.  *See Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349 (5th Cir. 2015).  To establish willfulness, Snead must prove that EOG had actual knowledge it was violating the FLSA or showed reckless disregard as to whether it was committing the alleged violations.  *Zannikos*, 605 F. App'x at 349; *see also McLaughlin v. Richland Shoe*, 486 U.S. 128, 133 (1988).  As the U.S. Supreme Court has explained, "the willfulness standard is a **formidable** one because the FLSA's two-tiered statute of limitations 'makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful

violations."   *McLaughlin*, 486 U.S. at 133 (emphasis added).   To be clear, negligence or even unreasonableness is insufficient to establish willfulness.  *Zannikos*, 605 F. App'x at 349.

>    a.    **No Court or Agency Has Found that EOG was Violating the FLSA.**

The crux of Snead's argument is that EOG was willful because other FLSA lawsuits have been filed against the company and the company has not audited or changed its pay practices.  Mot. at 36-39.  This merely show that EOG is a corporation, corporations are sued, and that FLSA cases are common and have been on the rise for the past decade.  *See* Seyfarth's 2017 Workplace Class Action Report, *available at* http://www.workplaceclassaction.com/2017/01/its-here-seyfarths-2017-workplace-class-action-report/; *see also* Kerry Curry and Mark Curriden, "*Overtime Lawsuits Are On the Rise in Texas*," Houston Chronicle (Dec. 26, 2014),   http://www.houstonchronicle.com/business/article/Overtime-lawsuits-are-on-the-rise-in-Texas-5980748.php.   Moreover, Snead conspicuously omits that **_zero_** of the lawsuits resulted in a court or jury finding that EOG was improperly paying workers under the FLSA.[6]  Depo. Goodman at 102:9-18.  In addition, none of the lawsuits involved Snead's same logistics coordinator position.  Depo. Goodman at 48:16-49:1; 62:19-63:1; 70:24-71:18; 85:14-24;  89:22-90:3; 101:18-102:8;  *see also* Ex. L, Def's Answer to No. 1, Pl's First Set of Interrogatories.  Likewise, no federal or state agency has ever told EOG that it was violating the FLSA.  *See* Ex. L, Def's Answer to No. 2, Pl's First Set of Interrogatories.  To the contrary, the Texas Workforce Commission issued a decision in 2016, finding that EOG was properly treating workers as independent contractors.  *Id.*

A history of litigation is insufficient for a finding of willfulness.  *See Mascagni v. Schlumberger Tech Corp.*, No. 16-439, 2017 WL 3648315, at *7 (W.D. La. Aug. 22, 2017) (rejecting argument that defendant was willful because of its "long history of being sued for FLSA overtime violations"

---

[6] The fact that EOG's counsel of record in this case also represented EOG in the other lawsuits has no bearing on the issue of willfulness and whether EOG had actual knowledge it was violating the FLSA or acted in reckless disregard.  Mot. at 36-37 n.15.  Not only is this irrelevant to the legal inquiry, any insinuation of impropriety is offensive.

because "all of the cases Plaintiff cites either settled, were overturned on appeal, or remain pending. No court in any of the proceedings ever ruled the [defendant] violated the FLSA's overtime compensation provisions"). Moreover, the two cases Snead relies on are inapposite. Both cases involve vastly different factual scenarios with actual knowledge of wrongdoing. *Compare Mohammadi v. Nwabuisi*, 171 F. Supp. 3d 545, 549 (W.D. Tex. 2016) (explaining plaintiff "testified that she repeatedly asked [defendant] to compensate her for unpaid time that she was working" and that defendant promised it would take "care of" it), *with Alvarez v. Amb-Trans, Inc.*, No. 11-cv-179, 2012 WL 4103876, at *9 (W.D. Tex. Sept. 17, 2012) (involving a defendant who was investigated by the DOL and who "changed his payment policies to match what he learned from the investigation").

### b. The Timing of the Lawsuits and EOG's Litigation Defense is Irrelevant.

Critically, the timing of the lawsuits filed against EOG undercuts Snead's claim. With the exception of one lawsuit that was filed before Snead started contracting with EOG, only four were filed during the time period Snead was contracting with EOG. Mot. at 36. The remaining lawsuits were filed ***after*** Snead stopped contracting. Therefore, most of the lawsuits have no bearing on the proper legal inquiry of willfulness as to EOG's actions toward Snead. Similarly irrelevant is Snead's focus on how EOG is defending its cases—which has no role in the legal question of willfulness. Snead's focus on these lawsuits and litigation defense are unwarranted attempts to besmirch EOG and avoid his real burden to prove willfulness. In sum, the existence of these lawsuits, the only evidence that Snead presents, does not show that there are no genuine issue of facts on willfulness.

## CONCLUSION

Accordingly, Defendant EOG Resources, Inc. respectfully requests that the Court deny Plaintiff's Motion for Partial Summary Judgment (Doc. 39). EOG requests all further relief to which it is justly entitled.

Dated: January 19, 2018

Respectfully submitted,

*/s/ Carter Crow*

M. Carter Crow
State Bar No. 05156500
Kimberly F. Cheeseman
State Bar No.  24082809

**NORTON ROSE FULBRIGHT US LLP**
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:       (713) 651-5151
Facsimile:       (713) 651-5246
carter.crow@nortonrosefulbright.com

*Attorneys for Defendant EOG Resources, Inc.*

## CERTIFICATE OF SERVICE

This pleading was served on the following opposing counsel in compliance with Rule 5 of the Federal Rules of Civil Procedure on January 19, 2018.

**Counsel for Plaintiffs:**

Michael A. Starzyk
April L. Walter
Matthew S. Yezierski
Megan M. Mitchell
Starzyk & Associates, P.C.
10200 Grogans Mill Rd., Suite 300
The Woodlands, Texas 77380
Telephone:  (281) 364-7261
Facsimile:  (281) 364-7533
mstarzyk@starzyklaw.com
awalter@starzyklaw.com
myezierski@starzyklaw.com
mmitchell@starzyklaw.com

*/s/             Kimberly Cheeseman*

Kimberly F. Cheeseman